# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Nos. 24-3144, 24-3145

IN RE: CITY OF CHESTER, PENNSYLVANIA,
Debtor

CITY OF CHESTER

v.

PHCC LLC d/b/a Preston Hollow Community Capital;
PRESTON HOLLOW CAPITAL, LLC; COUNTY OF DELAWARE;
CHESTER DOWNS AND MARINA, LLC d/b/a Harrahs
Philadelphia Casino and Racetrack; COVANTA DELAWARE
VALLEY, L.P.; ET AL.

PHCC LLC d/b/a Preston Hollow Community Capital;
PRESTON HOLLOW CAPITAL, LLC; U.S. BANK TRUST CO.,
NATIONAL ASSOCIATION, as Indenture Trustee,
Appellants in No. 24-3144

COUNTY OF DELAWARE,
Appellant in No. 24-3145

_____

Appeal from the U.S. Bankruptcy Court, E.D. Pa.
Bankruptcy Judge Ashely M. Chan, No. 22-ap-00084
Before: SHWARTZ, MATEY, and SCIRICA, *Circuit Judges*
Argued: Sep. 30, 2025; Filed: Jul. 17, 2026

_____

OPINION OF THE COURT

MATEY, *Circuit Judge*. After decades of economic turmoil, the city of Chester, Pennsylvania declared bankruptcy in 2022. Before filing, the City pledged several revenue streams to creditors who argue their liens survive the bankruptcy. Since

some of the proceeds of those streams might constitute conveyed property acquired by Chester "after the commencement of the case," 11 U.S.C. § 552(b)(1), we will remand in part for a closer consideration of the creditor's contracts.

# I.

## A.

Chester is a financially distressed municipality in Delaware County, Pennsylvania that, for the past thirty years, has been under financial oversight by the Commonwealth. Along the way, Chester pursued several projects aimed at reversing its fiscal fortunes. They did not, and those ventures are the source of this controversy. We begin by summarizing the deals.

**1.** In 1989, Chester and Delaware County entered into a "Host Community Agreement" with Westinghouse Electric Corporation to develop a trash incinerator (or, more formally, a "resource recovery facility"). Under that Agreement, Westinghouse's assignee—Covanta Delaware Valley, L.P.—pays Chester fees (the "Host Community Revenues") based on the volume of trash processed, originally in the amount of $2.50 per ton of solid waste processed at the facility, and not less than $2 million per year.

Next, in 2008, Chester welcomed Harrah's Philadelphia Casino and Racetrack and the following three cash flows:

First, under Pennsylvania's Race Horse Development and Gaming Act (the "Gaming Act"), Chester is entitled to a "slot machine license operation fee" of "$10,000,000 annually, less any amount up to $5,000,000 received pursuant to a

written agreement with a licensed gaming entity" (the "Slot Machine Revenues"), payable quarterly from the Pennsylvania Department of Revenue. 4 Pa. C.S. § 1403(c)(3)(iii).[1]

Second, also under the Gaming Act, Chester is entitled to payments equal to half of 2% of Harrah's daily gross table gaming revenue (the "Table Game Revenues"). 4 Pa. C.S. § 13A63(c)(2); (f). Like the Slot Machine Revenues, the Table Game Revenues are paid to the Pennsylvania Department of Revenue, which sends Chester a quarterly distribution. *Id.* § 13A63(c).

Third, separately from the Gaming Act, Chester and Harrah's agreed that Chester would receive a sum based on the casino's monthly gross revenue from table games and slot machines (the "Additional City Consideration"). This agreement includes a "Credit Toward Statutory Minimum"[2] allowing the

---

[1] Section 1403(c)(3)(iii) originally provided Chester with "2% of the gross terminal revenue or $10,000,000 annually, whichever is greater." *See* 4 Pa. C.S. § 1403(c)(3) (2010). This section was ruled unconstitutional under the Uniformity Clause of the Pennsylvania Constitution because it imposed additional obligations on casinos outside of Philadelphia. *Mount Airy # 1, LLC v. Pa. Dep't. of Revenue*, 154 A.3d 268, 278 (Pa. 2016). It was thus amended in 2017 to entitle Chester only to a flat fee of $10,000,000. Act of Oct. 30, 2017, P.L. 419, No. 42, § 27 (codified at 4 Pa. C.S. § 1403(c)(3) (2018)).

[2] This exception was based on a "Credit Provision" in the original version of Section 1403(c)(3)(iii), which, as discussed above, was ruled unconstitutional in 2016. But nothing in the record shows that this contractual provision was repudiated after the demise of the Credit Provision. To the contrary:

Additional City Consideration to count toward the $10 million Harrah's must pay for the Slot Machine Revenues, but only if the casino's "annual gross [slot machine] revenue is an amount less than $10,000,000." App. 1527.[3]

2.  In 2009, Chester announced plans to build a new stadium for a professional soccer team and enacted the "2009 Ordinance," allowing the City to incur debt and contribute funds to Delaware County. The 2009 Ordinance directed Chester to "make a contribution to the County . . . in accordance with the terms and provisions of a Contribution Agreement." App. 842. Section 6 of the 2009 Ordinance purportedly "irrevocably pledge[d]" the Slot Machine Revenues to the County and granted the County a security interest in those revenues. App. 844. Delaware County also entered into a purchase agreement with Citigroup Global Markets, Inc. for $28,595,000 in bonds (the "2009 Bonds").

3.  Finally, in 2009, Chester and Delaware County executed the Contribution Agreement that, under the 2009 Ordinance, secured Delaware County's interest in the Slot Machine Revenues. Section 4.01 of the Contribution Agreement states that "the City hereby pledges and grants to the County a security interest in and to all such [Slot Machine] Revenues." App.

---

In a summary judgment motion in the adversary proceeding below, some of the appellants characterized this provision as fully in force.

[3] This seems to have been the norm. For instance, in 2022, Harrah's paid out $7,295,086.36 in Slot Machine Revenues and $2,704,913.64 in Additional City Consideration, for a total of $10,000,000.

4

497. On February 18, 2009, Delaware County perfected its interest by filing a Financing Statement.

**B.**

Slots and soccer did not turn the tide, and Chester continued its fiscal fall. So in 2017, the City enacted another Ordinance (the "2017 Ordinance") authorizing additional debt in newly issued bonds. Section 6 of the 2017 Ordinance purported to "irrevocably pledge[]" the Slot Machine Revenues, Table Game Revenues, and Host Community Revenues "for the payment of . . . the Bonds," and granted a "security interest in and to all such" revenue streams. App. 520. Section 17 of the 2017 Ordinance mandated the creation of a Trust Indenture with U.S. Bank Trust Company, N.A. ("U.S. Bank") as Trustee "under which the Bonds will be issued and secured." App. 523. Chester subsequently issued two series of bonds for a total original principal of $19,210,000 (the "2017 Bonds"). The sole holder of the 2017 Bonds is Preston Hollow.[4]

Chester and U.S. Bank executed the Trust Indenture in 2017. In addition to the Slot Machine Revenues, the Table Game Revenues, and the Host Community Revenues, the Indenture included a fourth stream: the Additional City Consideration (collectively, the "Pledged Revenues"). Section 5.01 of the Trust Indenture mandated that the "[Pledged] Revenues . . . are hereby pledged and a security interest is therein granted."

---

[4] "Preston Hollow" refers collectively to PHCC LLC d/b/a Preston Hollow Community Capital and Preston Hollow Capital, LLC.

App. 545. U.S. Bank then perfected its interest by filing a Financing Statement.

Per Section 5.02 of the Trust Indenture, funds from the Pledged Revenues—received from the Pennsylvania Department of Revenue (for the Slot Machine Revenues and the Table Game Revenues), Covanta Delaware Valley L.P. (for the Host Community Revenues), and Harrah's (for the Additional City Consideration)—were to be placed in a Revenue Fund controlled by U.S. Bank. After obligations to more senior creditors were satisfied, funds from the Revenue Fund were transferred into two accounts to satisfy Chester's obligations for the 2017 Bonds. When the money in those accounts exceeded the amount due for Chester's bond obligations, Trust Indenture Section 5.02(e) provided that "any [excess] Pledged Revenues or other funds deposited in the Revenue Fund or any account thereof shall be transferred to the City to an account specified in writing thereby." App. 546. U.S. Bank's practice was to seek a "direction letter" from Chester before wiring these Excess Funds.

## C.

In the end, none of these projects were sufficient to stave off insolvency. Following a declaration of fiscal emergency, Chester was placed into receivership. On November 10, 2022 (the "Petition Date"), the City's receiver filed for Chapter 9 bankruptcy, and commenced an adversary proceeding against Preston Hollow, Delaware County, and U.S. Bank (collectively, the "Creditor Defendants"). The Revenue Fund on that date amounted to $4,445,242.41. On February 21, 2023, pursuant to a consent order, U.S. Bank distributed $1,000,000 of the Revenue Fund to Chester and $2,000,000 to creditors

including Preston Hollow and Delaware County. This left $1,445,242.41 in Excess Funds—a sum which remains disputed by the Parties (the "Disputed Excess Funds"). Additionally, on the Petition Date, the City was owed $1,360,845.07 in Pledged Revenues—$1,287,141.85 from the Pennsylvania Department of Revenue and $73,703.22 from Harrah's (the "Pre-Petition Accruals").

**D.**

The parties moved for summary judgment. Preston Hollow and U.S. Bank (the "Bond Parties") jointly argued that Section 552(a) does not cut off their liens on the post-petition Pledged Revenues because: (1) the 2017 Ordinance created an exempted statutory lien; (2) the Pledged Revenues are exempted "proceeds"; and (3) certain of the Pledged Revenues are exempted "special revenues." The Bond Parties also argued that U.S. Bank properly refused to transfer the Disputed Excess Funds to Chester after the Petition Date. Finally, the Bond Parties argued that the Pre-Petition Accruals, although they had not yet been paid out to Chester, were pre-petition property subject to liens. Delaware County argued that its lien on the Slot Machine Revenues similarly was not cut off by Section 552(a).

The Bankruptcy Court ruled that while the Creditor Defendants had properly perfected their interests, Section 552(a) cut off all liens on the Pledged Revenues. *In re City of Chester*, 655 B.R. 555, 568–76 (Bankr. E.D. Pa. 2023). The Bankruptcy Court also ruled that the Trust Indenture obligated U.S. Bank

7

to transfer the Disputed Excess Funds to Chester. *Id.* at 565–67. This appeal followed.[5]

**II.**

The Bond Parties and Delaware County both argue that their liens were created solely by the 2009 and 2017 Ordinances, making them "statutory liens" that survive Chester's bankruptcy filing. We disagree, as the Creditor Defendants' liens, while authorized by the two Ordinances, depend on the contractual Contribution Agreement and Trust Indenture to have effect.

**A.**

"The Bankruptcy Code recognizes three types of liens: judicial, statutory, and consensual." *Graffen v. City of Phila.*, 984 F.2d 91, 96 (3d Cir. 1992). A consensual lien is a security interest "created by an agreement"—that is, a contract. 11 U.S.C. § 101(51). A statutory lien is a "lien arising *solely* by force of a statute on specified circumstances or conditions . . . whether or not statutory, but does not include security interest

---

[5] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(b) and 1334. The District Court certified this matter for direct appeal under 28 U.S.C. § 158(d)(2)(A)(i) because it involves "a question of law as to which there is no controlling decision of the court of appeals for the circuit" and "a matter of public importance." We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291 and "review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998) (citing *In re Engel*, 124 F.3d 567, 571 (3d Cir. 1997)).

or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute." *Id.* § 101(53) (emphasis added). It "arises automatically and is not based on an agreement." *In re Schick*, 418 F.3d 321, 323 (3d Cir. 2005) (citation omitted); *see also In re Lionel Corp.*, 29 F.3d 88, 94 (2d Cir. 1994) ("[L]iens that come into being as a result of statutory operation, without consent or judicial action, are 'statutory liens.'"). The Bankruptcy Code's "definition of statutory lien . . . specifically excludes [consensual liens] . . . even in those cases where the [consensual lien] . . . is dependent upon the existence of the statute to be fully effective." *In re Rones*, 531 B.R. 526, 530 (Bankr. D.N.J. 2015), *rev'd in part on other grounds*, 551 B.R. 162 (D.N.J. 2016).

Statutory liens can survive bankruptcy filings, while consensual liens usually cannot. Subject to several exclusions, *see* 11 U.S.C. § 552(b), "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting *from any security agreement* entered into by the debtor before the commencement of the case," *id.* § 552(a) (emphasis added). "As the text of [the] provisio[n] makes clear, the general rule of section 552(a) . . . appl[ies] only to a 'lien resulting from [a] security agreement.' [It does not] appl[y] to statutory liens." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 1, 7 (1st Cir. 2018) (citation omitted).

Contrary to the Creditor Defendants' assertions, their liens do not arise solely from statute.[6] True, Section 6 of the

---

[6] The Bond Parties assume that the Ordinances are statutes from which statutory liens may arise. *See Cloverleaf Trailer Sales Co. v. Pleasant Hills*, 76 A.2d 872, 875 (Pa.

2009 Ordinance and Section 6 of the 2017 Ordinance both contain lien-creating language, but so do the Contribution Agreement and the Trust Indenture. Section 4.01 of the Contribution Agreement establishes that Chester "hereby pledges and grants to the County a security interest in and to all such [Slot Machine] Revenues." App. 497. Similarly, Section 5.01 of the Trust Indenture mandates that "[t]he Revenues . . . to be held or set aside pursuant to this Indenture by the Trustee . . . are hereby pledged and a security interest is therein granted." App. 545. Indeed, the liens contemplated in the 2009 and 2017 Ordinances *depend* on the subsequent lien-creating language in the Contribution Agreement and the Trust Indenture. In the recitals and in Section 4 of the 2009 Ordinance, agents of the City are "directed to execute . . . the Contribution Agreement," App. 843**,** and the City's contribution must be made "in accordance with the terms and provisions of [that] Contribution Agreement." App. 842. Section 17 of the 2017 Ordinance "authorize[d] the execution and delivery of . . . the Trust Indenture" under which the 2017 Bonds "will be issued and secured." App. 523. Further, an Amendment to the 2017 Ordinance provides that the Trust Indenture may "remove" any revenue streams from the Pledged Revenues "if necessary or desirable." App. 528. And the 2017 Ordinance only contemplates a lien upon three revenue streams, while the Trust Indenture ultimately grants a lien upon a fourth: the Additional City Consideration.

---

1950) ("A municipal ordinance is in reality a statute . . . ."). We take no position on whether the Ordinances are statutes for the purposes of a statutory lien, as in any event, they do not create liens without the subsequent operation of the Trust Indenture and Contribution Agreement.

As the Bankruptcy Court correctly explained, "the [2009] Ordinance's operative force is inherently dependent upon the substance of the Contribution Agreement," *Chester*, 655 B.R. at 571, and "[t]he efficacy of the 2017 Ordinance is wholly dependent on the existence of the Trust Indenture," *id.* at 570. "The Trust Indenture defines the form and term of the 2017 Bonds, issue of obligations owed, redemption of the 2017 Bonds, the collateral securing payment of the 2017 Bonds, and all other key characteristics of the transaction," *id.*, while "the Contribution Agreement details the form and nature of the City's payment pledge to Delaware County, serves as the security agreement pledging the Harrah's Revenues to Delaware County, and includes a schedule of contribution payments to be made by the City," *id.* at 571.

## III.

The Bankruptcy Code also allows liens on "special revenues," including "special excise taxes," to persist past bankruptcy filings. 11 U.S.C. §§ 902(2)(B), 928(a). The Creditor Defendants argue that the Slot Machine Revenues and the Table Game Revenues arise from special excise taxes and so survive the Petition Date.[7] But the Bankruptcy Court correctly found that the Slot Machine Revenues and the Table Games Revenues arise not from taxes, but from fees, as the former is

---

[7] The Bond Parties also argue that the Additional City Consideration is a special excise tax. But the Additional City Consideration arises from "the payment of money founded upon contract." *Meriwether v. Garrett*, 102 U.S. 472, 513 (1880). This is not a tax. *See id.*

11

"payment in exchange for a privilege not shared by others" for the operation of slot machines, and the latter "ultimately relates to the individual privilege only applicable to certain individual entities of holding a certificate to operate table games." *Chester*, 655 B.R. at 576. For that reason, neither survives discharge.

The obligations in the Slot Machine Revenues and the Tables Games Revenues are created by state law, so we first look "to that law to ascertain its attributes so that the court can determine its characterization under federal bankruptcy law," though ultimately "a court determines under federal law whether an obligation is a 'tax' for bankruptcy purposes." *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 252 (3d Cir. 2005). The Slot Machine Revenues arise from an obligation of Harrah's (and other casinos) to pay a sum to the Pennsylvania Department of Revenue "equal to 20% of the slot machine license fee paid at the time of issuance." 4 Pa. C.S. § 1326.1. These monies are then transferred to Chester. *Id*. § 1403(c)(3)(iii). It is these revenues that Chester has pledged to the Creditor Defendants as the Slot Machine Revenues. Concerning the Table Games Revenues, Harrah's must, "in addition to" a separate "table game ta[x]," pay a "local share assessment" into an "account established within the [state gaming] fund." 4 Pa. C.S. § 13A63(a). This local share assessment is then conveyed to Chester by the Pennsylvania Department of Revenue. *Id*. § 13A63(c)(2). These are the revenues that Chester has pledged to the Bond Parties as the Table Game Revenues.

The Creditor Defendants cannot show that the statutes creating the Slot Machine Revenues and Table Games Revenues would generally be considered "taxes" under Pennsylvania law. The relevant statutes refer (directly or indirectly) to

12

fees, not taxes. Sections 1326.1 and 1403(c)(3)(iii), from which the Slot Machine Revenues arise, refer to a "slot machine license operation fee." Additionally, a separate "slot machine tax" exists at 4 Pa. C.S. § 1403(b). Section 13A63(a), from which the Table Game Revenues arise, distinguishes the sum it obligates from a separate "tax . . . relating to table game[s]" at 4 Pa. C.S. § 13A62. "Although labels may not be dispositive, the statutory text actually chosen by the legislature is the best yardstick of the legislature's intent." *Tex. Ent. Assoc., Inc. v. Hegar*, 10 F.4th 495, 506 (5th Cir. 2021) (evaluating whether a given charge was a "fee" or "tax").[8]

While state law is not dispositive because it only helps "ascertain" whether an obligation is a tax under federal law, *City of New York v. Feiring*, 313 U.S. 283, 285 (1941), federal law is consistent with Pennsylvania's labelling of these charges as fees. "A tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the government." *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) (quoting *New Jersey v. Anderson*, 203 U.S. 483, 492 (1906)). Conversely, a "charge is a 'fee' . . . when it is for a 'benefit' granted to the payor that is 'not shared by other members of society.'" *F.C.C. v. Consumers'*

---

[8] While we "'look[ ] behind the label placed on the exaction' to 'the operation of the provision,'" *In re Szczyporski*, 34 F.4th 179, 185 (3d Cir. 2022) (citation omitted), this only means that a statutory label contrary to an exaction's function is "[ ]not . . . dispositive" as to whether that exaction is a tax, *United States v. Sotelo*, 436 U.S. 268, 275 (1978). Where, as here, the labels point in the same direction as the rest of the functional analysis, they are a useful (though not dispositive) factor.

*Research*, 606 U.S. 656, 678 (2025) (quoting *Nat'l Cable Tel-evision Ass'n, Inc. v. United States*, 415 U.S. 336, 341 (1974)). Here, Harrah's pays the Slot Machine Revenues and the Table Games Revenues for a benefit—operating slot machines and table games—not shared by other members of society.[9] The Slot Machine Revenues and the Table Game Revenues thus arise from fees.[10]

---

[9] Courts have also used the six so-called *Lorber-Suburban* factors to determine whether a charge is a tax for bankruptcy purposes. *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 253 (3d Cir. 2005) (quoting *In re Lorber Indus. of Cal., Inc.*, 675 F.2d 1062, 1066 (9th Cir. 1982); *In re Suburban Motor Freight, Inc.*, 36 F.3d 484, 488–89 (6th Cir. 1994)). But these "six factors [do not] constrain our inquiry," which is ultimately a "functional examination." *Id.*; *see also Szczyporski*, 34 F.4th at 185 ("[O]ur examination of an exaction under *United Healthcare* is a 'flexible' one that 'allows us to consider the characteristics of the obligation in light of the evolving treatment of priority claims under the Bankruptcy Code.'") (citation omitted). As in *United Healthcare*, we decline to undertake an independent analysis of the *Lorber-Suburban* factors, although we recognize that they remain "helpful in undertaking this functional examination." *United Healthcare*, 396 F.3d at 256.

[10] Because we conclude that these revenues do not arise out of taxes, we need not analyze whether they are excise taxes nor whether they are "special." *United Healthcare*, 396 F.3d at 252 n.8

14

**IV.**

The Creditor Defendants argue that the Bankruptcy Court incorrectly held that their security interests do not include "proceeds" that could survive the bankruptcy. The Bankruptcy Court's decision referred to language in the Trust Indenture that conveyed the City's interest in all Pledged Revenues "to be received." *Chester*, 655 B.R. at 572. But the Trust Indenture also contains a Granting Clause conveying more than an interest in Pledged Revenues "to be received." Moreover, there are material differences between the conveyances in the Trust Indenture and the Contribution Agreement. Accordingly, we will remand to the bankruptcy court to consider the issue of proceeds in light of this language.

**A.**

Recall that Section 552(a) establishes the general rule that property acquired by a debtor after a bankruptcy filing "is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Section 552 also creates an exception for "proceeds" of "property of the debtor acquired before the commencement of the case" if the debtor's security interest contemplates such proceeds and the proceeds are recognized by "applicable nonbankruptcy law." 11 U.S.C. § 552(b)(1).

As defined by applicable nonbankruptcy law—here, the Uniform Commercial Code, as adopted by Pennsylvania[11]—

---

[11] *See In re Bumper Sales, Inc.*, 907 F.2d 1430, 1437 (4th Cir. 1990) ("[W]e hold that the UCC's definition and treatment of proceeds applies to Section 552 of the Bankruptcy

15

"proceeds" must arise out of some collateral. 13 Pa. C.S. § 9102. This includes, for example, "[w]hatever is acquired upon the sale . . . of collateral" and "[w]hatever is collected on . . . account of collateral." *Id.* For instance, proceeds may be "cash or stock dividends distributed on account of securities . . . that [are] original collateral." UCC § 9-102 cmt. 13(a).

The Bankruptcy Court concluded that neither of the Creditor Defendants' security interests extended to "proceeds" for the purposes of Section 552(b)(1) because they did not convey any collateral separate from the Pledged Revenues themselves. *Chester*, 655 B.R. at 572. But there are differences between the Contribution Agreement and the Trust Indenture. The Contribution Agreement guaranteed that "the City hereby pledges and grants to the County a security interest in and to all such [Slot Machine] Revenues," App. 497, yet the Granting Clause of the Trust Indenture assigns to U.S. Bank "a security interest *in all of the right, title and interest of the City* in and to the [Pledged] Revenues," App. 535 (emphasis added).[12]

While some bankruptcy decisions state that an interest in a revenue stream categorically does or does not come with

Code."); *In re Lease-A-Fleet, Inc.*, 152 B.R. 431, 435 (Bankr. E.D. Pa. 1993) ("[W]hether a creditor's rights fit within the § 552(b) exception is determined by reference to applicable non-bankruptcy law. . . agreed to be the Pennsylvania UCC.").

[12] The Bankruptcy Court referred to this language in the context of perfection but did not reference it when considering the issue of proceeds. *Compare In re City of Chester*, 655 B.R. 555, 568 (Bankr. E.D. Pa. 2023), *with id*. at 572.

an attendant right to payment separate from the stream itself,[13] the correct approach is fact-intensive:[14] Did the security agreement actually convey *a right to be paid*, or did only it convey the *revenue* itself? Two cases which consider both sides of the issue help our analysis.

---

[13] *Compare In re EDG Holdings, Inc.*, 438 B.R. 154, 162 (Bankr. S.D. Ill. 2010) ("The [revenues], in and of themselves, are not the only collateral in this case. Rather, it is these monies *and what they represent*—i.e. contractual payment rights . . . —which comprise the defendants' collateral.") (emphasis in original), *and In re Gateway Access Sols., Inc*., 368 B.R. 428, 432 (Bankr. M.D. Pa. 2007) (substantially the same), *with In re Froid*, 109 B.R. 481, 484 (Bankr. M.D. Fla. 1989) ("This court is satisfied that there is no support for th[e] proposition [that a right to a revenue stream can be collateral] because the security interest . . . was granted to the [revenue streams] and not to some other collateral from which the [revenue streams] are derived."), *and In re Las Vegas Monorail Co.*, 429 B.R. 317, 343 (Bankr. D. Nev. 2010) (substantially the same).

[14] *See Johnson v. Cottonport Bank*, 259 B.R. 125, 128 (W.D. La. 2000) ("When the debtor grants a security interest in the right to receive a stream of future payments, the security interest continues post-bankruptcy if the right to receive the payments existed prior to bankruptcy and the debtor need not do anything after bankruptcy to make them continue."); *In re Cnty. of Orange*, 189 B.R. 499, 505 (C.D. Cal. 1995) ("Appellants have not demonstrated they have an interest in the County's pre-bankruptcy petition right to collect taxes. The lien only gave Appellants an interest in taxes collected, not in the right to collect taxes.").

17

**B.**

In *Smoker v. Hill & Associates*, an insurance salesman settled a state court lawsuit by pledging away his commissions, assigning "all of Smoker's right, title, and interest in and to all commissions, moneys, and proceeds . . . now due or that may hereafter become due to Smoker in connection with placement, sale, or brokering of insurance contracts, policies, or products." 204 B.R. 966, 968–69 (N.D. Ind. 1997). When Smoker later declared bankruptcy, the bankruptcy court held that "while the insurance commissions are postpetition property of the debtors' estate, they nonetheless fall within the exception set forth in § 552(b)." *Id.* at 973.

*Smoker* was distinguished by *In re Kizis*, 238 B.R. 89 (Bankr. M.D. Pa. 1999). A debtor—again an insurance salesman—secured a bank loan with the commissions that he earned on policy renewals. *Id.* at 90. The security agreement defined this "Collateral" as "Guardian General Agency Renewal Account," and guaranteed the bank "a security interest in the Collateral . . . [and] all present and future products of Collateral and all present and future Proceeds of Collateral." *Id.* at 91. When the debtor went bankrupt, the Bankruptcy Court decided "the Bank's security interest in renewal commissions was cut off by the filing of the bankruptcy as contemplated by 11 U.S.C. § 552(a) [and the] exceptions as contained in subsection 552(b) do not apply." *Id.* at 94. The court compared the language of this security agreement to the collateral assignment in *Smoker* and ruled that "the collateral subject to the security interest is in the renewal commissions themselves and not in the Debtor's prepetition contractual right to receive those commissions as in the *Smoker* case," as "[t]he language found in . . .

18

the [s]ecurity [a]greement . . . is unambiguous and contemplates only commissions as collateral." *Id.*

The conveyance in the Contribution Agreement is like the language in *Kizis*. It does not contemplate any intangible right to payment distinct from the revenues themselves, only an "interest in and to such . . . Revenues." App. 497. By this logic, there would be no "collateral" distinct from the revenues from which proceeds could be derived.[15] Conversely, the Granting Clause of the Trust Indenture is functionally identical to that in *Smoker* because it "assigns forever a security interest in all of the right, title and interest of the City in and to the [Pledged] Revenues," App. 535, and so appears to contemplate an interest in a right to payment that is distinct from an interest in the Pledged Revenues themselves. This would establish a separate collateral, the proceeds of which would survive the Petition Date. But in the proceedings below, the Bankruptcy

---

[15] Delaware County urges that this conclusion would be inconsistent with the Bankruptcy Court's ruling that the County was conveyed an interest in a "payment intangible" that could be perfected by filing a Financing Statement. But just because the County was conveyed an interest in future payments does not mean that it was conveyed an interest in a right to payment. The Bankruptcy Court decided that the Trust Indenture gave the Bond Parties an "interest in a right to payment" for the purposes of perfection, but, notably, it did not say that Delaware County was conveyed the same. *Chester*, 655 B.R. at 568. In any event, to the extent that our direction to the correct language affects the bankruptcy judge's decision about the perfection of the interests of either Delaware County or the Bond Parties, we invite her to revisit her ruling.

Court only considered the language in the Trust Indenture that granted U.S. Bank a right in future amounts "to be received" from the Pledged Revenues. *Chester*, 655 B.R. at 572. It did not consider the language of the Granting Clause. *See id.*

That distinction may make a difference, and we will remand for the Bankruptcy Court to consider whether the Granting Clause of the Trust Indenture conveyed U.S. Bank a right to payment from which proceeds may be derived. And the Bankruptcy Court should also consider how the differing language of the Contribution Agreement may affect the interest conveyed to Delaware County. It may be that neither Delaware County nor the Bond Parties are entitled to any proceeds— even if one or both was conveyed a right to payment from which proceeds may be derived—because those proceeds were indeterminate at the time of the bankruptcy filing. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 385 F.Supp.3d 138, 150 (D.P.R. 2019) ("Until the post-petition computations [were] performed based upon post-petition facts, the receivable . . . [did] not exist."). As the Bankruptcy Court noted, "[t]he future receipt of Pledged Revenues necessarily depends on future payments from Covanta and Harrah's, which depend in turn on the amount of waste collected by Covanta and the volume of activity conducted at Harrah's following the Petition Date." *Chester*, 655 B.R. at 573 n.10. We leave it to the Bankruptcy Court to determine whether the resolution of this issue would moot any disagreement over the interests conveyed to Delaware County and the Bond Parties.[16]

---

[16] The Creditor Defendants also argue that they have an interest in the "Pre-Petition Accruals"—the $1,360,845.07 owed to Chester by Harrah's and the Pennsylvania Department of Revenue that had accrued by the Petition Date but had not

20

**V.**

Finally, the Bond Parties[17] argue that the Bankruptcy Court improperly ordered the transfer of the Disputed Excess Funds—the $1,445,242.41 left over in the Revenue Fund after the last disbursement of Pledged Revenues to Preston Hollow and Delaware County—to Chester. They are incorrect. Section 5.02(e) of the Trust Indenture mandates that "[o]nce the amounts on deposit . . . equal the principal and interest due on the 2017 Bonds on the next succeeding Interest Payment Date . . . any Pledged Revenues or other funds deposited in the Revenue Fund or any account thereof *shall* be transferred to the City[.]" App. 546 (emphasis added). The Trust Indenture thus mandates the transfer of Excess Funds to Chester as soon as the Pledged Revenues satisfy Chester's obligations on the 2017 Bonds. *See Atkinson v. LaFayette Coll.*, 460 F.3d 447, 452 (3d Cir. 2006) ("Where the language is clear and unambiguous, the express terms of the contract will control.").[18]

\* \* \*

---

yet been paid out. The Bankruptcy Court did not address this question, so we will remand for its consideration.

[17] Delaware County does not join this argument.

[18] Section 5.02(e) also directs that excess funds be dispersed to the City to an "account specified in writing," App. 546, and the Bond Parties argue that this is a condition precedent: that the funds cannot be sent to Chester until the City first specifies an account. They are incorrect. "The rule in Pennsylvania is that a condition precedent to an obligation must be expressed by clear language or it will be construed as a promise

21

For the foregoing reasons, we will AFFIRM the Bankruptcy Court on the issues of statutory liens, special revenues, and the transfer of the Disputed Excess Funds. We will REMAND on the issues of proceeds and the Pre-Petition Accruals.

*Counsel for Appellants PHCC LLC d/b/a Preston Hollow Community Capital; Preston Hollow Capital, LLC; and U.S. Bank Trust Company, N.A.*
Nathan Coco        [Argued]
Kaitlin D. Martin
Emily Kanstroom Musgrave
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

Mark D. Taticchi
FAEGRE DRINKER BIDDLE & REATH LLP

*Counsel for Appellant U.S. Bank Trust Company, N.A.*
David E. Lemke
Hannah L. Berny
HOLLAND & KNIGHT LLP

*Counsel for Appellant County of Delaware*

---

or covenant." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1016 (3d Cir. 1980). The relevant language in Section 5.02(e) is not clearly conditional, so it cannot be construed as a condition precedent.

Nicholas M. Engel      [Argued]
David B. Smith
SMITH KANE HOLMAN, LLC

*Counsel for Appellee City of Chester, Pennsylvania*
Matthew A. Hamermesh      [Argued]
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

*Counsel for Amicus Appellee Official Committee of Retired Employees of the City of Chester Pennsylvania*
Robert D. Gordon
BOIES SCHILLER FLEXNER LLP